**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

KERRY JENNIFER SCROGGINS,

     Plaintiff,

v.                                                                  Civil Action No.   3:24cv367

TRANS UNION, LLC,

     Defendant.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **KERRY JENNIFER SCROGGINS** (hereafter "Plaintiff" or "Ms. Scroggins"), individually and on behalf of a class of similarly situated consumers, by Counsel, and as for her Complaint against **TRANS UNION, LLC** ("Defendant" or "Trans Union") states as follows:

## PRELIMINARY STATEMENT

1.    This is an action for statutory, actual, and punitive damages, costs, and attorney's fees for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA").

2.    "Congress passed the Fair Credit Reporting Act (FCRA) in response to concerns about data brokers assembling detailed dossiers about consumers and selling this information to those making employment, credit, and other decisions. People often have little choice about whether to enter into business relationships with these companies or whether they will be tracked, yet the data these companies collect may nevertheless play a decisive role in significant life decisions, like buying a home or finding a job. The FCRA provides a range of protections, including accuracy standards, dispute rights, and restrictions on how data can be used. The law covers data brokers like credit reporting companies and background screening firms, as well as

those who report information to these firms." *CFPB launches inquiry into the business practices of Data Broker*s (Mar. 15, 2023) Consumer Financial Protection Bureau, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-launches-inquiry-into-the-business-practices-of-data-brokers/ (last accessed on June 22, 2023).

3.      Defendant is engaged in the sale of the personal data to which the CFPB refers. Defendant wrongly characterizes this personal data as "credit header" information outside the ambit of the FCRA. Defendant collects, maintains, warehouses, parses, and sells reports about consumers that include data collected in whole or in part for an FCRA-governed purpose. In fact, it is a "Big 3" consumer reporting agency. And yet, it cannot resist the money to be made at finding ways to sell its consumer data outside of FCRA purposed reports.

4.      Defendant sells its credit reporting data to data resellers and businesses like LexisNexis, disclaiming that the data it sells is FCRA regulated. Relevant here, Trans Union contracts with LexisNexis to sell individual consumer data.  Specifically for this case, Trans Union collects the subject data it sells to LexisNexis—deceased reporting—using the same process it follows to generate consumer reports containing data reported to it in the ordinary course of creditors reporting accounts and related payment histories. The data sold to LexisNexis originates from the same database Trans Union uses to create and sell consumer reports to creditors (prospective or otherwise) like banks, credit unions, and mortgage lenders.

5.      Trans Union falsely and erroneously reported Plaintiff as deceased in the consumer report it sold to LexisNexis. Defendant sold this false information even though its own records reflected that Plaintiff was not deceased.

6.      Because consumers may only confront consumer report inaccuracies if they are aware of them, 15 U.S.C. § 1681g(a) requires that Defendant provide not only "all information,"

but also "the sources of the information" in the consumer's file, and a comprehensive list of everyone, including end-users, to whom the Defendant has provided a report about the consumer. 15 U.S.C. § 1681g(a)(1)–(3).  Defendant violated § 1681g(a) because it failed to provide Plaintiff and numerous other consumers with "all information" regarding Defendant's deceased notation about them, the sources of this deceased notation, or a list of everyone to whom Defendant provided a report about them with a deceased notation.

7.      Plaintiff brings her §1681g claim on a class action basis on behalf of other consumers who requested and were refused a full and complete copy of their FCRA-mandated file disclosure, which has an economic value at an amount greater than $12.50.

8.      Additionally, Defendant violated 15 U.S.C. § 1681b when it sold Plaintiff's consumer report to LexisNexis in a manner which it was not entitled to use it pursuant to the law. 15 U.S.C. §1681b(a) contains restrictions on the circumstances in which a consumer report can be used. Defendant sold Plaintiff's consumer report to LexisNexis for a reason not permitted under 15 U.S.C. § 1681b(a). Defendant's failures to follow 15 U.S.C. § 1681b arise from its lack of procedures designed to avoid violations of 15 U.S.C. § 1681b, as required by 15 U.S.C § 1681e(a).

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

10.      Venue is proper in this District as Plaintiff is a resident in this District and Division, the violations described in this Complaint occurred in this District and Division, and the Defendant regularly and continuously transacts business within this District and Division.

## PARTIES

11.    The Plaintiff is a natural person residing in New Kent County, Virginia and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.    Defendant is limited liability company headquartered in Illinois and authorized to do business in Virginia through its registered office in Henrico County, Virginia.

13.    Defendant is "a consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

### *The Fair Credit Reporting Act's Accuracy Requirement is Rigorous*

14.    "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001).

15.    "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

16.    One of these measures, 15 U.S.C. § 1681e(b), "deal[s] with the procedures consumer reporting agencies must follow when collecting and transmitting information. Congress also gave individuals the right to sue reporting agencies for violations of FCRA. *Id.* § 1681e(b) sets forth the CRAs' overall duly:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke*, at \*4.

17.     Additionally**,** when Congress enacted the FCRA, it chose to codify consumers' rights to privacy as those rights relate to information found in consumer reports.

18.     Courts have long understood—and protected—the interest of individuals in guarding their right to privacy, including as it relates to sensitive personal information. "One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other. [T]he right of privacy is invaded by

(a)     unreasonable intrusion upon the seclusion of another . . .; or

(b)     appropriation of the other's name or likeness . . .; or

(c)     unreasonable publicity given to the other's private life . . .;

(d)     publicity that unreasonably places the other in a false light before the public . . . ."

*Restatement (Second) of Torts* § 652A (1977).

19.     Two of the many "right to privacy" provisions enacted by Congress under the FCRA are § 1681b(a) and § 1681e(a). Section 1681b(a) prohibits a consumer reporting agency ("CRA") like Trans Union from furnishing a report to a user for any reason outside of those specified in that section. Section 1681e(a) requires CRAs (like Trans Union) to "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b."

20.     In this instance, Trans Union used Plaintiff's information to furnish a consumer report regarding Plaintiff to LexisNexis.  The purpose behind Trans Union's report falls outside of the scope of the permissible reasons listed in § 1681b(a) and furnishing a consumer report about

Plaintiff for an impermissible purpose violated Plaintiff's right to privacy. If Trans Union had maintained procedures to avoid violations of § 1681b, as required by § 1681e(a), Trans Union would not have furnished the report to LexisNexis.

### *Defendant's Business*

21.     Defendant markets itself to a diverse group of potential organization-customers, including resellers[1], lenders, retail banks, credit unions, mortgage companies, and collection companies.[2]

22.     Defendant has operated in the consumer reporting business for decades, and now claims to "[h]elp drive profitability and operational efficiency." *Id.*

23.     Defendant partners with resellers, such as LexisNexis, to "[a]quire TransUnion data or solutions and resell them to [their] customers as a value-add."[3]

24.     Through its business model, Defendant's "credit information enables all kinds of businesses to make informed decisions when extending credit, making promotional offers, and facilitating a wide range of other activities essential to a healthy market economy. This credit information is based on the billions of updates [Trans Union] receive[s] each month from auto dealers and finance companies, banks, credit unions, mortgage companies, retailers, student loan providers, public records and more—for virtually every market-active adult in the United States.[4]

---

[1] https://www.transunion.com/about-us/partners (last accessed on Apr. 26, 2024).

[2] https://www.transunion.com/industry/financial-services (last accessed on Apr. 26, 2024).

[3]https://www.transunion.com/about-us/partners (last accessed on Apr. 26, 2024).

[4] https://www.transunion.com/data-reporting/data-reporting (last accessed on Apr. 26, 2024).

25.     Defendant sells consumer reports to resellers. In turn, resellers sell consumer reports to financial institutions like credit unions, retail banks, credit card lenders, and automobile loan lenders for use in determining whether consumers like Plaintiff meet the terms of the account.

26.     LexisNexis is one such reseller Defendant partners with to sell its consumer reports. The consumer reports Defendant sold to LexisNexis about Plaintiff determined whether Plaintiff maintained access to services for her bank account and whether she could be approved for an increase in her debit card daily spending limit.

***Defendant Sells Consumer Reporting Data to LexisNexis***

27.     Defendant agreed to sell consumer reports to LexisNexis which contained deceased indicators pertaining to specific consumers. LexisNexis obtained authority from Defendant to share these consumer reports with its banking and lending customers, including Call Federal Credit Union, for identity verification and fraud prevention.

28.     Navigating an identity verification is like the key to the vault in today's lending world—essential for everything from securing an auto loan to accessing your bank accounts. Given this, it strains credulity to think that a consumer reporting agency like Trans Union, fully aware its sale of consumer reports to its reseller partners like LexisNexis, doesn't expect its consumer reports to influence creditworthiness assessments, especially when they are expressly for identity verification purposes.

29.     Yet, to perpetuate the fiction that deceased indicators fall outside the coverage of the FCRA, Trans Union referred to the consumer reports it sold to LexisNexis as "credit header data" or "consumer indicative information," not consumer reports. "Credit header data" consists of "the name, address, social security number, and phone number of [a] consumer." *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 17 (D.D.C. 2001), *aff'd sub nom. Trans*

*Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002). The Federal Trade Commission (FTC) previously stated that "[a] report limited to identifying information such as a consumer's name, address, former addresses, or phone number, does not constitute a 'consumer report' if it does not bear on any of the seven factors and is not used to determine eligibility." Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 21.[5]   A deceased indicator obtained by a CRA for use in consumer reports cannot be characterized as "credit header data" outside the ambit of the FCRA. No regulator or Court has ever found that a deceased indicator constitutes "credit header data." Numerous courts have found that inaccurately reporting consumers as deceased is governed by the FCRA and violates the FCRA's protections.[6]

30.     As the FCRA sets forth, a consumer report is:

Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B)

_____

[5]  Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf. Notably, the U.S. Court of Appeals for the District of Columbia Circuit, in *dicta*, strongly indicated that consumer addresses may in fact constitute consumer reports in certain circumstances. *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 816 (D.C. Cir. 2001) (questioning FTC's conclusion that P.O. Box address information does not bear on one of the seven factors encompassed by the definition of "consumer report" in § 1681a(d)(1) but finding it unnecessary to resolve the question to reach its decision).

[6] *See, e.g.*, *Groettum v. Kohl's Dep't Stores, Inc*., 2020 WL 788945 (D. Minn. Feb. 18, 2020); *Estate of Rennick v. Universal Credit Servs., L.L.C.*, 2019 WL 196539 (E.D. Pa. Jan. 15, 2019); *Thompson v. Equifax Info. Serv., L.L.C.*, 2018 WL 1381135 (E.D. Pa. Mar. 19, 2018); *Howell v. Equifax Info. Serv., L.L.C.*, 2017 WL 76892 (E.D. Mo. Jan. 9, 2017); *Waletzko vs. Corelogic Credco, L.L.C.*, 2016 WL 5879597 (W.D. Wis. Oct. 7, 2016); *Noori v. Bank of Am*., 2016 WL 3124628 (C.D. Cal. May 26, 2016); *Sheldon v. Experian Info. Sols., Inc.*, 2010 WL 3768362 (E.D. Pa. Sept. 28, 2010); *Perez v. Trans Union, L.L.C.*, 526 F. Supp. 2d 504 (E.D. Pa. 2007); *Gohman v. Equifax Info. Serv., L.L.C.*, 395 F. Supp. 2d 822 (D. Minn. 2005); *Schmitt v. Chase Manhattan Bank*, 2005 WL 2030483 (D. Minn. Aug. 23, 2005); *Anderson v. Trans Union, L.L.C.*, 345 F. Supp. 2d 963 (W.D. Wis. 2004).

employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d).

31.     FTC guidance has long held that including part of a tradeline within the name and address credit header report makes it a consumer report:

> A list of consumers' names and addresses, if assembled or defined by reference to characteristics or other information that is also used (even in part) in eligibility decisions, is a series of consumer reports. For example, a list comprised solely of consumer names and addresses, but compiled based on the criterion that every name on the list has at least one active trade line, updated within six months, is a series of consumer reports.

40 YEARS OF EXPERIENCE WITH THE FCRA at 21. In *Trans Union Corp. v. F.T.C.*, which reviewed the FTC's Order requiring TransUnion to cease from selling consumer reports for target marketing purposes, the D.C. Circuit found that "substantial record evidence supports the Commission's finding that" the "mere existence of a tradeline is a 'factor in credit-granting decisions.'" *Id.* at 816 (quoting *Trans Union Corp. v. F.T.C.*, 81 F.3d 228, 233 (D.C. Cir. 1996)).

32.     The "used or expected to be used or collected in whole or in part" clause of § 1681a(d) "incorporates three distinct concepts: ultimate use, expectation of use, and reason for compilation", and communicated information that falls within "any one of the clause's components" constitutes a "consumer report," so long as it bears on one of the seven factors in § 1681a(d). *Yang v. Gov't Emps. Ins. Co.*, 146 F.3d 1320, 1324-25 (11th Cir. 1998); *see also Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1273-74 (9th Cir. 1990) ("The plain language of section 1681a(d) reveals that a credit report will be construed as a 'consumer report' under the FCRA if the credit bureau providing the information expects the user to use the report for a purpose permissible under the FCRA, without regard to the ultimate purpose to which the report is actually put."); *Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 n.10 (7th Cir. 1988) ("Because

of the circular definition of 'consumer report,' § 1681b's limitations on the dissemination of consumer reports are essentially rendered meaningless if the…determination of whether a report is a consumer report is made solely by looking at the reason for which the report is requested").

33.     Identifying a consumer as "deceased" bears on her "credit worthiness, credit standing, credit capacity, [and] general reputation" because the dead lack any credit worthiness, credit standing, and credit capacity and most, if not all, businesses view the deceased moniker as an indicator of fraud and, after seeing it attached to the file of someone who applies for an account or account services, will refuse to deem "deceased" consumer eligible for any account (credit or otherwise) or account services. Further, no employer will hire an employee identified as deceased, and government agencies will not grant licenses or other benefits to deceased individuals.

34.     It is beyond dispute that Defendant operates as a CRA. As reflected in the *Credit Reporting Resource Guide* ("CDIA Resource Guide"), Trans Union obtains consumer reporting data, like deceased indicators, because "credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories." Consumer Data Industry Association, *Credit Reporting Resource Guide*, Responsibilities and Roles, 1-1 (2020).[7]

35.     Defendant knew, for years before reporting Plaintiff as deceased, that the information it sold to LexisNexis containing deceased indicators as to specific consumers constituted consumer report data governed by the FCRA.

36.     Defendant "collected" the consumer reports and sold them to its financial services customers and reseller partners with reasonable expectation that the consumer reports it sold would

_____

[7] The Consumer Data Industry Association, "[a]n international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries," publishes the CDIA Resource Guide to help "provider[s] of consumer data understand[] the tools that are available and adhere[] to the standards for credit reporting." *Id.* at Responsibilities and Roles, 1-1, 1-2.

be used, "in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for credit, insurance, employment purposes, or one or more of the permissible purposes listed in § 1681b.

37.     Nothing in the FCRA allowed Defendant to transmute deceased indicators tied to specific consumers, i.e., consumer reports, "collected" in whole or in part for consumer reporting purposes into "credit header data" and resell them outside the ambit of the FCRA. FTC guidance makes this clear:

> INCORPORATION OF INFORMATION FROM PRIOR CONSUMER REPORTS
> If information from a consumer report is added to a report that is not otherwise a consumer report, that report becomes a consumer report.
>
> REPORT CONCERNING A *"CONSUMER'S"* ATTRIBUTES AND HISTORY
> A report from a CRA on the personal credit of a consumer to a business credit grantor is a "consumer report" regardless of the purpose for which the information may in fact be used. Reports obtained from CRAs on consumers retain their character as "consumer reports" even if they are subsequently furnished in connection with a commercial credit or insurance transaction.

40 YEARS OF EXPERIENCE WITH THE FCRA at 20-21.

38.     Trans Union knowingly sold consumer report data to LexisNexis containing deceased indicators pertaining to specific consumers.

39.     In the alternative to the allegation that TransUnion knowingly sold these reports to LexisNexis for use in a credit eligibility decision, Plaintiff alleges that TransUnion lacked any permissible purpose to furnisher Plaintiff's report under 15 U.S.C. § 1681b.

40.     Furnishing a consumer report to a third party is presumptively illegal. The only purposes for which a consumer reporting agency may furnish a report are the purposes listed in 15 U.S.C. § 1681b(a).

41.     Out of section 1681b(a)'s list of permissible purposes, the only two that could apply in the context of the report(s) that Trans Union sold to Lexis Nexis regarding Plaintiff are § 1681b(a)(2) ("In accordance with written instructions of the consumer to whom it relates") and § 1681b(a)(3)(F)(i) ("To a person which it has reason to believe . . . otherwise has a legitimate business need for that information . . . in connection with a business transaction that is initiated by the consumer[.]").

42.     The consumer report that Trans Union created and furnished concerning Plaintiff was neither "in accordance with the written instructions of" Plaintiff nor "in connection with a business transaction" that was initiated by Plaintiff. Trans Union did not even have reason to believe that there was a legitimate business need for the information in connection with a business transaction initiated by Plaintiff, because Trans Union had actual knowledge that Plaintiff was not deceased, Plaintiff's use of her accounts clearly indicated that she was not deceased, and Plaintiff's name was not part of the SSA's Master Death List. To put it another way, Trans Union lacked any information that could form the basis of a "reason to believe" in a legitimate business need as described in § 1681b(a)(3)(F)(i).

43.     Trans Union invaded Plaintiff's privacy and violated 15 U.S.C. § 1681b(a) when it furnished consumer report(s) to LexisNexis without a permissible purpose to do so.

### *Defendant Sells Consumer Reports to Its Reseller Partners*

44.     Even assuming the FCRA somehow permitted Defendant's transmutation of "consumer reports" into non-FCRA data it sold to LexisNexis, Defendant nonetheless sells "consumer reports" to its customers because these customers regularly use the information purchased from Defendant for various permissible purposes, as delineated by § 1681a(d)(1).

45.     Likewise, Courts have long held that reports issued to a user for collection purposes fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, *or review or collection of an account of, the consumer.*'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

46.     Meanwhile, LexisNexis acknowledges that it is a CRA: "FCRA Services. If a Customer desires to use a product described in a Schedule A as an FCRA product, Customer will execute an FCRA Addendum to the Master Terms. The FCRA product will be delivered by an Affiliate of LNRSFL, LexisNexis Risk Solutions Inc., in accordance with the terms and conditions of the Master Terms." *Master Terms* at 2(v); *see also Banko Events Monitoring*, available at https://risk.lexisnexis.com/products/banko-events-monitoring (last accessed on June 22, 2023) ("Banko® is a consumer reporting agency product provided by LexisNexis Risk Solutions and is fully compliant with the Fair Credit Reporting Act, 15 U.S.C. 1681, et seq."); *LexisNexis RiskView Solutions Brochure*, available at https://risk.lexisnexis.com/-/media/files/product%20pages/brochure/LexisNexis-riskview-solutions-overview-brochure-nxr12070-01-0322-en-us.pdf (last accessed on June 22, 2023) ("RiskView™ is a consumer reporting agency product provided by LexisNexis Risk Solutions Inc. and may only be accessed in compliance with the Fair Credit Reporting Act, 15 U.S.C. 1681, et seq.")

### *Defendant is a Consumer Reporting Agency*

47.     As the FCRA sets forth, a consumer reporting agency is:

[A]ny ***person***[8] which, ***for monetary fees***, dues, or on a cooperative nonprofit basis, ***regularly engages*** in whole or in part ***in the practice of assembling*** or evaluating consumer credit information or ***other information on consumers for the purpose of furnishing consumer reports to third parties***, and which uses any means or facility ***of interstate commerce for the purpose of preparing*** or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

48.     As demonstrated above, Defendant operates as a CRA because (1) in exchange for compensation; (2) Defendant regularly assembles information on consumers; (3) for the purpose of furnishing consumer reports; and (4) by means of interstate commerce.

49.     As to the first element, there is no dispute that Defendant receives compensation from its customers. Someone paying money to another in exchange for a product or service is the definition of "customer."

50.     Defendant collects, maintains and then parses out consumer reporting information from a wide range of sources to provide consumer reports to its customers, as acknowledged in its marketing materials and numerous court decisions.

51.     Defendant enters into contracts with financial institutions and other businesses which expressly provide that these customers may use the information provided under these contracts for purposes governed by the FCRA. These contracts acknowledge that Defendant is a consumer reporting agency under the FCRA. Further, Defendant receives disputes from consumers

---

[8] "Person" is defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

on a regular basis confirming that its reports are used by its customers for permissible purposes described by the FCRA.

52.     Additionally, Defendant utilizes multiple means of interstate commerce to sell its reports, which are disbursed to prospective users around the nation.

### Defendant Reports Plaintiff as Deceased in Multiple Consumer Reports

53.     As pertinent here, Defendant sold multiple consumer reports to LexisNexis identifying Plaintiff as "deceased" and LexisNexis in turns resold those reports to its lender customer, Call Federal Credit Union.

54.     Identifying Plaintiff as "deceased" bore on her "credit worthiness, credit standing, credit capacity, [and] general reputation" because being reported with a deceased marker is the ultimate statement that you lack any credit worthiness, credit standing, and credit capacity and most, if not all, creditors view the deceased moniker as an indicator of fraud and, after seeing it attached to the file of someone who applies for an account or account services, will refuse to deem a "deceased" consumer eligible for any account (credit or otherwise) or account services. 15 U.S.C. § 1681a(d)(1).

55.     In fact, this is "[o]ne of the worst types of inconsistent file cases" where "the reporting of a live consumer as deceased . . . results in the entire file essentially shutting down[.]" National Consumer Law Center, Fair Credit Reporting (10th ed. 2022), updated at www.nclc.org/library, 4.4.6.3.3 *Reporting living consumers as deceased*.

56.     Defendant knows that when it reports a consumer as "deceased" to a credit union, the credit union will use that information "as a factor in establishing the consumer's eligibility for…credit or insurance to be used primarily for personal, family, or household purposes." *Id.* Defendant likewise knows that when it reports a consumer as "deceased" to a reseller like

LexisNexis—who then sells that data to a credit union for identity verification—that information will be used "as a factor in establishing the consumer's eligibility for…credit or insurance to be used primarily for personal, family, or household purposes." *Id.*

57.     Defendant knows that reporting a consumer as "deceased," on its own or through a reseller, to a prospective creditor like a credit union effectively precludes that consumer from obtaining credit sought by the consumer.

58.     Defendant knows that when it reports a consumer as "deceased" to a credit union, on its own or through a reseller, the credit union will use that information for a purpose governed by the FCRA.

59.     On or about April 29, 2021, Plaintiff contacted Call Federal Credit Union ("Call Federal") to inquire about an auto loan to purchase a used car.

60.     On or about May 20, 2021, Plaintiff encountered difficulty accessing her online banking with Call Federal because she changed her phone number. She could not receive the passcode necessary to access online banking because it was going to her old phone number. Plaintiff's online banking afforded her access to numerous services pertaining to her loan account and checking account with Call Federal, including online payments and transfers, payment assistance, digital wallets, and mobile deposit capture.[9] Plaintiff called Call Federal to attempt to rectify this situation, but she was advised of LexisNexis's "deceased" reporting and prohibited

---

[9] Call Federal's standard Membership and Account Agreement states, in part" "[y]ou authorize us to check your account, credit and employment history, and obtain reports from third parties, including credit reporting agencies, to verify your eligibility for the accounts and services you request." *Membership and Account Agreement*, available at https://callfederal.org/wp-content/uploads/2017/05/Membership-and-Account-Agreement.pdf (last accessed on June 22, 2023).

from accessing any account services. Call Federal provided Plaintiff with a telephone number to reach LexisNexis.

61.     Concerned that LexisNexis was not the only consumer reporting agency reporting her as deceased, Plaintiff also requested her consumer file disclosure from Trans Union on May 21, 2021.

62.     The May 21, 2021 Consumer File Disclosure Defendant provided to Plaintiff did not include the deceased moniker that, as Plaintiff would later learn, Defendant had reported to LexisNexis. Defendant's May 21, 2021 Consumer File Disclosure was therefore incomplete as it did not include all of the consumer reporting data Defendant was reporting about Plaintiff.

63.     The May 21, 2021 Consumer File Disclosure was also deficient because it did not identify all of the entities to whom Defendant had sold Plaintiff's consumer report.

64.     Yet, May 21, 2021 Consumer File Disclosure gave no indication to Plaintiff that Trans Union was or had been reporting her as deceased for LexisNexis.

65.     Plaintiff obtained her Trans Union Consumer File Disclosures again on or about June 21, 2021, June 22, 2021, November 4, 2021, December 7, 2021, June 14, 2022, August 10, 2022, and June 22, 2023—yet in each Consumer File Disclosure, Trans Union withheld vital information it was reporting about Plaintiff and to whom it had reported that information.

66.     Online banking services provide a channel for consumers to access credit and its connected financial services: "[c]onsumers are using mobile financial services (MFS)—financial services and products accessed through mobile phones and other devices—more and more to access accounts, pay bills, deposit funds and manage their financial lives." CFPB, *Mobile Financial        Services*,        3        (Nov.        2015),        available        at

https://files.consumerfinance.gov/f/201511_cfpb_mobile-financial-services.pdf. These services save consumers time, money, and fees. *Id.* at 46.

67. Congress enacted the FCRA, in part, "to…promote the efficiency of the nation's banking…system[]." 40 YEARS OF EXPERIENCE WITH THE FCRA at 1.

68. Call Federal used the consumer reports Defendant sold to LexisNexis "to determine whether the terms of [Plaintiff's]…checking account[s] should be modified." Defendant knew that Call Federal and other bank and credit union customers of LexisNexis would use Defendant's consumer reports to determine whether consumers would be allowed to maintain full access to their checking and savings accounts.

69. Plaintiff is not deceased. The Social Security Administration Death Master File did not and does not include Plaintiff's Social Security number as that of a deceased person.

70. Between May 2021 and June 2022, Plaintiff was repeatedly and denied access to banking services with Call Federal based on the false "deceased" notation contained in the consumer reports Defendant compiled and sold to Lexis Nexis, who resold the reports to Call Federal. The obstacles Plaintiff faced include: i) loss of access to online banking; 2) the inability to increase the purchase limit on her debit card so she could make a $5,000.00 payment for a home improvement purchase using the "credit" feature, which runs the debit payment through a credit card network like Visa;[10] 3) denied access to mobile banking and denial of an Apple Pay transaction using her Call Federal checking account; and difficulty removing "fraud alert[s]" in connection with this attempted Apple Pay transaction—obstacles which were all based on the

---

[10] This is still a debit card transaction, but the cardholder may receive certain benefits like zero liability for fraudulent purchases by selecting the "credit" feature.

deceased consumer reporting data Defendant indirectly sold to Call Federal Credit Union through LexisNexis.

71.     Plaintiff thereafter spent over a year disputing the deceased reporting with LexisNexis, exhausting significant time and out-of-pocket expenses disputing the deceased reporting with LexisNexis.

72.     However, relying on the May 21, 2021 Trans Union Consumer File Disclosure LexisNexis, Plaintiff thought LexisNexis was the sole source of the sole deceased reporting. Eventually, Plaintiff filed *Scroggins v. LexisNexis Risk Solutions FL Inc.,* No. 3:22-cv-545-MHL (E.D. Va.) to seek the protections afforded by the Fair Credit Reporting Act to hold LexisNexis accountable for violations of the FCRA.

73.     In or around April 2023, Plaintiff learned in discovery in *Scroggins v. LexisNexis,* that Trans Union was responsible for the origination of the deceased monikers in consumer reporting data it sold to LexisNexis about Plaintiff.

74.     Following the initial discovery of the deceased reporting in May 2021, Plaintiff spent over a year disputing inaccurate information within her consumer file with LexisNexis, never realizing that Trans Union was to blame for the origination of the inaccurate consumer report and sale of that inaccurate report to LexisNexis. Plaintiff endured substantial hardship because of Defendant's failure to report accurate information within Plaintiff's consumer file and failure to disclose the complete contents of Plaintiff's Consumer File Disclosure to Plaintiff.

75.     Defendant has been repeatedly sued in federal court by consumers alleging that it violated the FCRA by inaccurately reporting information without following reasonable procedures to assure that the information it sold about consumers was maximally accurate.

76.     Plaintiff has been prevented from accessing banking services that she should have otherwise qualified for due to the inaccurate reporting of being deceased that Defendant continued to include in Plaintiff's consumer reports to LexisNexis—and by extension—Call Federal.

77.     As a result of Defendant's conduct, actions, and inaction, Plaintiff suffered damages to include, but not limited to, loss of credit, out-of-pocket expenses, aggravation, emotional stress, inconvenience, embarrassment, and frustration.

78.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

79.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff" and a failure to make the correction right away. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008). Further, a lack of any internal procedures to anticipate or prevent inaccuracy is willful. *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 249–50 (4th Cir. 2017).

80.     The FCRA sections at issue here, and informative guidance, have been around now for over 50 years. The FCRA's caution of Defendant's "grave responsibilities" to ensure accuracy has not changed.

81.     The FCRA requires that Defendant must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

82.     In November 2021, when Plaintiff asked one of LexisNexis's representatives what Defendant did to make her deceased, the representative responded that the deceased indicator was in Plaintiff's "unverified public records."[11]

83.     Defendant employs no procedures at all which assure that a consumer with a "deceased" mark on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report to its reseller partners and lending customers.

84.     Such a policy is reckless for a number of reasons, not the least of which that Trans Union nearly always possesses other information showing that the consumer is indeed alive—such as that the consumer is paying her insurance policies or that creditors are accessing the consumer's information from Trans Union for purposes of making a present decision about granting the consumer credit.

85.     Even in instances where other data on the face of the consumer's report indicates that she is not deceased, Trans Union employs no procedures which assure that a consumer with a "deceased" notation on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

86.     Once a "deceased" mark is placed on a consumer's report and the consumer disputes the accuracy of the reporting, Trans Union will not correct its reporting.

87.     Defendant knows that living consumers are prohibited from accessing vital financial services because Defendant is reporting them as "deceased."

---

[11] Of course, it is now known that even that was untrue as demonstrated in discovery obtained from LexisNexis in *Scroggins v. LexisNexis.* Plaintiff has learned that the deceased marker was reported to LexisNexis by TransUnion and then resold by LexisNexis to Call Federal and maybe others.

88.     Trans Union further knows that reporting a consumer as deceased is the most harmful notation that can be attached to one's consumer file. There is no more derogatory notation—not bankruptcy, foreclosure, or repossession—than reporting a consumer as deceased.

89.     Defendant is therefore aware that reporting a consumer as deceased is devastating to the consumer because it effectively halts the consumer's ability to engage in the financial services market.  Financial institutions view the "deceased" notation as indicative of fraud and will refuse to grant financial services of any kind to any customer identified as "deceased" by Defendant.

90.     Defendant has been on notice for years through consumer disputes and lawsuits that living consumers are unable to access financial services because Defendant is reporting them as "deceased."

91.     Trans Union has received thousands of disputes from consumers complaining that their Trans Union consumer reports have them erroneously marked as "deceased."

92.     Trans Union knows that thousands of consumers are wrongfully marked as "deceased" on their Trans Union consumer reports, but those consumers are not on the Death Master File and are, in fact, alive.

93.     Nevertheless, Trans Union employs no procedures which assure that a consumer marked as "deceased" on Trans Union's consumer reports are, in fact, deceased.

94.     Defendant also does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

95.     At all times relevant to this Complaint, Trans Union was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Trans Union.

96.    At all times relevant to this Complaint, the conduct of Trans Union as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff.

97.    At all times relevant to this Complaint, Defendant's conduct was willful and carried out in reckless disregard for consumers' rights under the FCRA. By example only and without limitation, Defendant's failure to implement any procedure to identify and correct common errors prior to furnishing reports was willful because it ran a risk of harm that was known or so obvious it should have been known.

98.    Defendant's conduct was likewise willful because it indiscriminately noted Plaintiff as deceased when it knew from her request for her consumer report, and from its own consumer reports about Plaintiff, that she is alive.

99.    Defendant's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

**COUNT ONE: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681e(b)**
**Class Claim**

100.    Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

101.    **The Inaccuracy Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined as:

> All natural persons who (a) were the subject of a report or other data furnished by Defendant to a commercial third party within the five years before the filing of this action; (b) where that report identified the person as deceased based on a deceased value it collected for use in its consumer reporting database; (c) where the person identified in the report was not deceased.

Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

102.    **Numerosity**. Plaintiff alleges that the Inaccuracy Class is so numerous that joinder of the claims of all class members is impractical. Defendant operates as one of the largest CRAs in the nation, and in Virginia alone it certainly has sold tens if not hundreds of thousands of consumer reports during the class period. Given the common nature of Defendant's "deceased" reporting, the class size will easily exceed hundreds or thousands of consumers. The names and addresses of the class members are identifiable through documents maintained by Defendant, and the class members may be notified of the pendency of this action by publication or mailed notice.

103.    **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant had reasonable procedures to assure that it accurately identified individuals as deceased; (b) whether Defendant's conduct constituted a violation of the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of the Plaintiff and putative class members.

104.    **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. § 1681e(b). This claim challenges the consumer reporting procedures of Defendant and does not depend on any individualized facts. For purposes of class certification, Plaintiff seeks only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify.

In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the class.

105.  **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

106.  Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.  As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this

case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

107.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports they furnished regarding Plaintiff and the Inaccuracy Class. Despite Defendant knowing or at least having reason to know Plaintiff and the class members were alive, it published their consumer reports to end users indicating they were deceased.

108.    Defendant's violations of 15 U.S.C. § 1681e(b) were willful, rendering it liable pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

109.    Plaintiff and each class member are entitled to recover statutory damages, punitive damages, costs, and attorneys' fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

## COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681g(a)
### Class Claim

110.    Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

111.    **The File Disclosure Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined as:

> All natural persons who (a) were the subject of search results furnished by Defendant to a third party within the five years before the filing of this action that contained a deceased record within what TransUnion claimed was "credit header" data; (b) who thereafter and within one year thereof requested from Defendant a "Consumer Disclosure Report" or other online, mailed or telephone request for the person's file; (c) and for whom Defendant did not include the search results

transaction as an inquiry.

Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

112.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Plaintiff estimates that the class is so numerous that joinder of all members is impractical. Class members' names and addresses are identifiable through documents maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

113.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendant was required by 15 U.S.C. § 1681g(a) to provide to consumers all of the information that Defendant reported about them in response to a request for a copy of their full file; (2) whether Defendant's conduct constituted a violation of the FCRA; and (3) whether Defendant's conduct was willful.

114.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

115.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members'

interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

116.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

117.     As described above, Defendant failed to provide Plaintiff and the File Disclosure Class all of the information in its files that Defendant had provided when Plaintiff requested a copy of her full file and the class members requested their full files.

118.     Defendant violated § 1681g(a) of the FCRA as to the Plaintiff and each of the class members by failing to provide them with all of the information that it possessed regarding deceased notations about them in their consumer files and a comprehensive list of everyone, including resellers such as LexisNexis, to whom Defendant provided a report with a deceased notation about them.

119.    Plaintiff and each putative class member suffered real and actual harm and injury. The rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Defendant's files and reports. In each instance, each class member was deprived of information that Congress has determined they were legally entitled to receive.

120.    For consumers lucky enough to learn that Defendant misidentified them as "deceased," Defendant provides no information about this false notation when these consumers ask for their file disclosures.

121.    Instead of revealing information it possesses and to whom it provided such information, Defendant refuses to provide any information pertaining to its reporting of consumers as deceased and to whom it furnished this information to consumers entitled to receive this information.

122.    This is problematic not just because it fails to meet the most basic disclosure requirement the FCRA demands, but Defendant does not let consumers know what information it is reporting or to whom Defendant gave it.

123.    Such secrecy and misdirection are the antithesis of the transparency Congress anticipated when it enacted § 1681g.

124.    Defendant knew that the FCRA required it to provide a complete disclosure, including all the information it possessed about Plaintiff and the File Disclosure Class at the time of their request and a list of the entities—like LexisNexis—to whom it had provided information about Plaintiff and the class.

125.    Despite this knowledge and the easy-to-interpret and follow statutory mandates, Defendant failed to meet its statutory duties to provide valid disclosures.

126.    As a result, Plaintiff and the class members were deprived of information to which they were statutorily entitled, and were also prevented from being able to learn the sources of information so that they could potentially correct inaccuracies Defendant was perpetuating about them, as well as being kept in the dark as to whom Defendant had provided information about them.

127.    As to Plaintiff and the File Disclosure Class, Defendant regularly fails to provide full file disclosures, in violation of 15 U.S.C. § 1681g(a).

128.    As a result of Defendant's failure to provide compliant disclosures, Plaintiff and the File Disclosure Class were subjected to the deprivation of information to which Congress has deemed them entitled upon a simple request.

129.    The value of a full file disclosure is significant and easily greater than $12.50.

130.    The denial of the full information required in such disclosure caused actual monetary harm in some amount at or over $12.50.

131.    The failure to provide disclosures also deprives consumers of information Congress has decided should be provided whenever they request it.

132.    Defendant's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

133.    As a result of these FCRA violations, Defendant is liable for statutory damages for Plaintiff and each class member, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681b(a)**
**Class Claim**

134.    Plaintiff repeats the allegations in the foregoing paragraphs as though fully set forth herein.

135.    **The Impermissible Pull Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined as:

> All natural persons who (a) were the subject of search results furnished by Defendant to a commercial third party within the five years before the filing of this action that contained a deceased record within what Trans Union claimed was "credit header" data; (b) not in connection with a business transaction that was initiated by the consumer or for any other permissible purpose.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

136.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by Defendant and the class members may be notified of the pendency of this action by published and/or mailed notice.

137.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Trans Union furnished reports for purposes outside of 15 U.S.C. § 1681b(a); (2) whether Trans Union's conduct constituted a violation of the FCRA; and (3) whether Trans Union's conduct was willful.

138.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the

other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

139.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members' interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

140.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by GDS's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

141.    Trans Union violated § 1681b(a) of the FCRA as to the Plaintiff and each of the class members by furnishing consumer reports (the subject of which were Plaintiff and each of the class members) without a permissible purpose.

142.    Plaintiff and each putative class member suffered real and actual harm and injury.

143.    The rights at issue were determined by Congress to be important measures to ensure the protection of consumers' privacy as related to the consumer reports Trans Union generates and distributes.

144.    In each instance, each class member's privacy was invaded when Trans Union furnished a report to a third party (1) containing a "deceased" record, and (2) for a purpose outside of those allowed by Congress pursuant to § 1681b(a).

145.    Defendant's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

146.    As a result of these FCRA violations, Defendant is liable for statutory damages for Plaintiff and each class member, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT FOUR – FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681e(a)**
**Class Claim**

147.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

148.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for violations of Section 1681e(a) for the same **Impermissible Pull Class** identified above.

149.     **Numerosity.** **Fed. R. Civ. P 23(a)(1).** Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by Defendant and the class members may be notified of the pendency of this action by published and/or mailed notice.

150.     **Predominance of Common Questions of Law and Fact.** **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Trans Union had in place reasonable procedures designed to avoid violations of 15 U.S.C. § 1681b(a); (2) whether Trans Union's conduct constituted a violation of the FCRA; and (3) whether Trans Union's conduct was willful.

151.     **Typicality.** **Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

152.     **Adequacy of Representation.** **Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because Plaintiff's interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members' interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

153.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

154.   As described above, Trans Union furnished a consumer report regarding Plaintiff and each of the putative class members for an impermissible purpose, invading the privacy of Plaintiff and the putative class members, in violation of § 1681b(a).

155.   Trans Union violated § 1681e(a) of the FCRA as to the Plaintiff and each of the putative class members by lacking procedures to prevent the furnishing of consumer reports regarding Plaintiff and each of the putative class members in violation of § 1681b.

156.   Plaintiff and each putative class member suffered real and actual harm and injury.

157.   The rights at issue were determined by Congress to be important measures to ensure the protection of consumers' privacy as related to the consumer reports Trans Union generates and distributes.

158.     In each instance, Trans Union had inadequate procedures in place (or no procedures in place at all) to prevent Trans Union from furnishing a report to a third party for reasons outside of those allowed by Congress pursuant to § 1681b(a).

159.     Trans Union's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.[12]

160.     As a result of these FCRA violations, Trans Union is liable for statutory damages from $100 to $1,000 for Plaintiff and each class member, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681n.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment against Defendant; for class certification as pleaded; for statutory and punitive damages for herself and each member of the Classes described above; for actual or statutory and punitive damages for her individual claims; for equitable and injunctive relief; and for attorneys' fees and costs and such other specific or general relief the Court finds just and appropriate.

**TRIAL BY JURY IS DEMANDED.**

---

[12] Plaintiff seeks statutory and punitive damages on behalf of herself and others. If class certification is denied, Plaintiff intends to seek actual damages for Defendant's violation.

Respectfully submitted,

**KERRY JENNIFER SCROGGINS**

By */s/ Leonard A. Bennett*
Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email:  craig@clalegal.com

Drew D. Sarrett, Esq., VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Phone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

*Counsel for Plaintiff*